**2014 BNH 011 Note: This is an unreported opinion. Refer to LBR 1050-1 regarding citation.**
_____

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re:                                                                      Bk. No. 13-10999-BAH
                                                                                 Chapter 7
Gerard L. Lemay,
        Debtor

Kev-Ray Investments LLC,
        Plaintiff

v.                                                                      Adv. No. 13-1113-BAH

Gerard L. Lemay,
        Defendant

*John J. Washburn*
*Law Office of John Washburn*
*Nashua, NH*
*Attorney for the Plaintiff*

*William Aivalikles*
*Law Office of William E. Aivalikles, PA*
*Nashua, NH*
*Attorney for the Defendant*

## MEMORANDUM OPINION

      Before the Court is the Motion for Summary Judgment (Doc. No. 57) (the "Motion") filed by the defendant and debtor in this case, Gerard Lemay (the "Defendant"). The plaintiff, Kev-Ray Investments LLC, (the "Plaintiff") objected to the Motion. In this adversary proceeding the Plaintiff seeks to except certain debts from the discharge under 11 U.S.C. § 523(a)(2)(A) and

1

(a)(6).   The dispute in this case is largely related to a leaking roof—specifically, the roof of the property the Plaintiff leased to the Defendant.   After the Defendant attempted unsuccessfully to repair the roof, he vacated the property, before the term of the lease had expired.   The debts the Plaintiff seeks to except from discharge relate to that series of events.   In the Motion, the Defendant argues that he is entitled to judgment as a matter of law on all three counts of the Plaintiff's complaint.   After reviewing the summary judgment record and weighing the arguments of the parties, the Court shall grant summary judgment as to Count I and deny it as to the remaining two counts.

## JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334, 157(a), and U.S. District Court for the District of New Hampshire Local Rule 77.4(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## BACKGROUND

The majority of relevant and material facts in this case are in dispute.   The Court will recount the undisputed facts and note where the positions of the parties differ—only to the extent necessary to set out a coherent factual background.   The Plaintiff is a New Hampshire limited liability company wholly owned and managed by Donald Dumont.   Dumont formed the LLC after Dumont and the Defendant had entered into the lease that is the framework of much of this dispute.   It was the Defendant who first approached Dumont about renting commercial property where he could start an automobile service business.   Dumont had recently entered into a separate transaction where he was to acquire the real property located at 30 East Hollis Street, in Nashua,

New Hampshire (the "Property").  The Defendant and Dumont visited the Property and discussed the possible terms of its lease.  During these initial viewings it became obvious to both parties that the roof of the Property needed repairs.  The roof and the repairs it needed accordingly featured in the negotiations over the lease.

The exact content and extent of these negotiations is in dispute.  The Plaintiff alleges that the Defendant made representations—to Dumont—about his experience in roof repair, specifically that he was an "expert."  The Defendant denies that he made those representations.  The Plaintiff also alleges that the Defendant made other representations that went into Dumont's decision to lease the Property to the Defendant, namely the existence of business partners that would help the Defendant start up the auto repair business.

Whatever the exact content of the negotiations, the parties entered into a lease agreement on May 28, 2009 for a four-year lease of the Property (the "Lease"), with the lease period to begin on June 2, 2009.  The Lease was originally between the Plaintiff and Dumont individually.  The Lease, however, contemplated that Dumont could assign his interest freely, and did not impose any express conditions or restrictions on such an assignment.  See Lease at 1 ("AGREEEMENT OF LEASE made this 5/28 of May, 2009 between Donald Dumont, or his assigns").  The parties do not dispute the assignability of the Lease.  Dumont immediately assigned the Lease to the Plaintiff after the Property came under his control.[1]

Among other things, the Lease required the following of the Defendant:

    a. Repair or replace the garage doors.
    b. Replace the side entrance steel door.
    c. Repair the rubber roof.
    d. Paint the entire building inside and out.

---

[1] The Plaintiff had a different name when it acquired the lease, but the Court does not find this fact material.

>e. Paint all floors with epoxy paint.
>f. Clean out the building and clean entire parking area.
>g. The existing heating system shall be repaired or replaced by the LESSEE, at LESSEE's sole cost and expense, if the LESSEE determines it is necessary to do so.
>h. In the event the electrical system is not sufficient to meet the LESSEE's needs, then the LESSEE shall upgrade or repair as needed at his sole cost and expense.

Lease at ¶ 6.

At some point after the parties entered into the Lease, the roof of the Property began to leak. The Defendant attempted to repair the roof but was not successful. The parties disagree over many of the facts surrounding the Defendant's attempts at repairing the roof. The Defendant asserts that he used his best efforts to repair the roof and that pre-existing structural defects blunted the success of his repair efforts. The Plaintiff argues that the Defendant did not really try to repair the roof, but rather intentionally damaged it as part of a scheme to get out of the Lease.

In October 2011, the Defendant vacated the Property. According to the Defendant, he moved out because the Property was unsafe and because the roof was still leaking. The Plaintiff argues that the Defendant was looking for an excuse to leave because his business was unsuccessful. The Defendant states that, at the time he abandoned the Property, he was current on all financial obligations to the Plaintiff, save for some amount of disputed real estate taxes owed under the Lease. The Plaintiff denies that the Defendant was current on rent or taxes.

After the Defendant abandoned the Property, the parties filed suit against each other in state court. The Defendant then filed his chapter 7 bankruptcy petition, which effectively halted the state court litigation. On July 21, 2013, the Plaintiff filed the adversary complaint that initiated the current proceeding. This complaint was later amended (Doc. No. 15) (the "Complaint").

4

The Complaint contains three counts. In Count I, the Plaintiff seeks to except from discharge debts owed by the Defendant on account of the damage he caused to the Property, specifically in his attempts to repair the roof. The Plaintiff asserts that this damage amounts to "willful and malicious injury" and is non-dischargeable debt under 11 U.S.C. § 523(a)(6). Count II of the Complaint is based on the Defendant's negotiation, performance, and various alleged breaches of the Lease. The Plaintiff asserts that the Defendant induced the Plaintiff to enter into the Lease through misrepresentations concerning the Defendant's roof-repairing expertise and his financial history serious enough to make the claimed damages non-dischargeable under § 523(a)(2)(A). Count III is a claim under New Hampshire RSA § 358-A:2, the Consumer Protection Act (the "CPA"), in which the Plaintiff claims the Defendant's conduct in negotiating the Lease and attempts at performing under the Lease violated the provisions of the CPA. The Plaintiff asks the Court to find the Defendant liable under the CPA and determine the resulting debt to be non-dischargeable under section 523(a)(2)(A).

After the Plaintiff amended the Complaint, the Defendant filed the Motion, seeking summary judgment on all counts; the Plaintiff objected.

## DISCUSSION

I.  Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to

5

change the outcome of the suit.'"   Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014) (quoting Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011)).   In assessing the summary judgment record, a court must draw all reasonable inferences in favor of the non-moving party but is "not obliged to accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the court by a party."   Adamson v. Walgreens Co., 750 F.3d 73, 78 (1st Cir. 2014) (citations omitted).

The Plaintiff has the burden of proof to prove a debt's nondischargeability under section 523(a)(2) by a preponderance of the evidence.   Grogan v. Garner, 498 U.S. 279, 283 (1991). Additionally, "exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's 'fresh start' policy, and, for that reason, the claimant must show that his claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)."   Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997) (citation omitted).

II.   Summary Judgment as to Count I: 11 U.S.C. § 523 (a)(6)

The Defendant argues that he is entitled to summary judgment on Count I because the Plaintiff has failed to present any evidence that the Defendant intentionally harmed the Plaintiff or his property.   Section 523(a)(6) provides that "(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt-- (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]"   The relevant legal standard for intent under section 523(a)(6) is set out by the United States Supreme Court in Kawaauhau v. Geiger:

6

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury."

Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998). Courts in this district have explained that under Geiger "the injury, not the act, must be willful, as injuries arising from negligent or reckless conduct are not excepted from discharge under section 523(a)(6). In re Graham, 363 B.R. 32, 38 (Bankr. D.N.H. 2007).

The Plaintiff cites to cases from within this Circuit that have found liability, post-Geiger, in situations where the debtor inflicted harm with *substantial certainty* of the injury that was likely to and did result. See Slosberg 225 B.R. 9, 18-19 (Bankr. D. Me. 1998) ("The first illustration offers practical guidance as to how this standard might factually appear: 'A throws a bomb into B's office for the purpose of killing B. A knows that C, B's stenographer, is in the office. A has no desire to injure C, but knows that his act is substantially certain to do so. C is injured by the explosion. A is subject to liability to C for an intentional tort.'") (quoting Restatement (Second) of Torts § 8A).

Assuming—without deciding—the Plaintiff is correct that the "substantial certainty" standard is viable under Geiger, the Plaintiff has not shown the existence of any evidence that meets this standard. No evidence in the summary judgment record shows that the Defendant undertook repairs to the roof while substantially certain that he would actually damage the Property. The Plaintiff points to some evidence tending show that the Defendant misused a roofing repair substance that had the potential to damage the roof further and that the Defendant did not actually have the knowledge or skill to properly repair the roof. Even if the Court were to take this evidence as the truth, the Plaintiff still has not produced evidence of willfulness within the

meaning of section 523(a)(6); at best that evidence demonstrates negligence or recklessness on the part of the Defendant. Accordingly, the Plaintiff, has failed to present any evidence on an essential element of his claim and the Court must grant summary judgment to the Defendant on Count I.

### III.    Summary Judgment as to Count II: 11 U.S.C. § 523(a)(2)(A)

To establish that a debt is nondischargeable under section 523(a)(2)(A), a creditor must satisfy six elements: the debtor (1) made a false representation, (2) with fraudulent intent or "scienter," (3) with the intent that the creditor rely on the misrepresentation, (4) actually inducing reliance, (5) that such reliance was justifiable, (6) causing damages. Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997).

First, the Defendant argues that he is entitled to summary judgment on Count II because the Court may not consider evidence of any pre-contractual negotiations between the parties: the Lease is a completely integrated document. See Lease ¶ 31. In essence, the Defendant asserts that Count II is foreclosed by the parol evidence rule. If the Court cannot consider the pre-Lease negotiations, where all of the alleged misrepresentations occurred, then the Plaintiff could not sustain its claim in Count II. However, the Defendant's argument ignores a well-trod exception to the parol evidence rule.

In New Hampshire, "the first step in determining whether parol evidence is admissible is to consider whether the writing is a total integration and completely expresses the agreement of the parties." Lapierre v. Cabral, 122 N.H. 301, 306 (1982). But, even if a court finds that a contract is totally integrated, "the parol evidence rule does not preclude the use of evidence tending to prove fraud or misrepresentation." Ingaharro v. Blanchette, 122 N.H. 54, 56 (1982). Since the

8

Plaintiff is trying to do just that in making his case under section 523(a)(2)(A), the Court does not need to address this point further.   Parol evidence is admissible with respect to Count II.

Second, the Defendant argues that the Plaintiff will be unable to prove that it relied on the misrepresentations because the pre-Lease negotiations took place between the Defendant and Dumont, not the Defendant and the Plaintiff.  In other words, the Defendant argues that the assignment of the Lease to the Plaintiff prevents the Plaintiff from relying on the Defendant's pre-lease representations.  As a preliminary matter, the Court notes that the Defendant has cited no authority to support this argument, but even aside from that fact, the argument is unavailing for two reasons.

First, while acknowledging the legal distinction between Dumont and the plaintiff, Kev-Ray Investments LLC, the Court notes that the factual difference between the two is slight. Dumont is the sole member and manager of the Plaintiff.  The parties agree that the pre-Lease negotiations took place between the Defendant and Dumont and that the assignment of the Lease occurred on the first day of the term of the Lease.  On this disputed record, it is unclear to the Court whether the assignment of the Lease to the Plaintiff was contemplated by both Dumont and the Defendant during the negotiation stage.  If the assignment was contemplated by the parties beforehand, the Defendant's position becomes unsustainable.  From his perspective, it would have been part of the transaction that the Plaintiff would rely on representations made to Dumont personally.   The Court is unwilling to close the door on this possibility at the summary judgment stage, given the factual uncertainty surrounding the negotiations.

The Court is unwilling to accept the Defendant's intervening assignment defense for a second reason, which is rooted in an interpretation of the reliance element of section 523(a)(2). Courts in the First Circuit do not appear to have addressed this issue in detail.   Outside of this

Circuit, courts have held that an intervening assignment should not prevent an assignee from attempting to prove its reliance on misrepresentations made to the assignor by a debtor, both in the context of section 523(a)(2)(A) and (a)(2)(B).[2]  In In re Borschow, a creditor—a friend of the debtor—agreed to lend money to the debtor in the midst of a poker game. Turbo Aleae Investments, Inc. v. Borschow (In re Borschow), 467 B.R. 410, 414 (N.D. Tex. 2012).  The creditor began by lending money to the debtor personally.  The creditor eventually assigned the debt to a corporation, in which the creditor had some ownership interest or authority.  The corporation continued lending the debtor money.  Id.  At some point, the debtor filed a chapter 7 bankruptcy case, and the corporation filed suit seeking to determine the debt to be nondischargeable under section 523(a)(2)(A).  Id. at 415.  The debtor in Borschow made the same argument the Defendant makes in this case: that the assignment prevented the corporation from proving reliance on statements made to the individual assignee-creditor.  Id. at 419.

The Borschow court did not accept this argument.  Citing prevailing precedent in the Ninth and Seventh Circuits, the court held that an intervening assignment did not bar a creditor from proving reliance on statements made by the debtor to an assignor.  Id.; see New Falls Corp. v. Boyajian (In re Boyajian), 367 B.R. 138 (B.A.P. 9th Cir. 2007) (assignment does not bar reliance by assignee in § 523(a)(2)(B) context); FDIC v. Meyer (In re Meyer), 120 F.3d 66, 70-71 (7th Cir. 1997) ("[T]he very reason that the institution of assignment exists is to enable [a] [c]reditor to transfer its rights against [d]ebtor[.]"). The court based its decision on both the

---

[2] Section 523(a)(2)(B) is a related sub-section of section 523(a)(2) distinguished from (a)(2)(A) in that the debtor makes misrepresentations in writing. The text of this sub-section reads: "(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-- (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-- (B) use of a statement in writing-- (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive[.]"  11 U.S.C.A. § 523 (West 2014).

language of the statute and policy considerations. First, nothing in the language of the statute prevented an assignee creditor from establishing reliance on statements made to the assignor. Borschow at 420 ("[T]he language of the statute does not suggest that loan's characterization as fraudulent somehow changes if the original creditor later assigns the loan."). Second, the court could find no policy reason to permit the debtor to escape possible nondischargeability claims "simply because the defrauded party later chose to assign the loan." Id. Finally, the court noted that the institution of assignment is central to the functioning of the debt market; allowing a debtor to escape claims of fraud would hinder the ability of assignees to rely on due diligence performed by the assignor:

> The purchasers of the loans rely on the original creditor to assess the risk of default. The original creditor, in turn, relies on the borrower to provide accurate information. If the borrower defrauded the original creditor, the bankruptcy code recognizes that the creditor should not have to suffer discharge—after all, the creditor assessed the risk based on false information. If that first assignment were to negate a means to challenge dischargeability, as Debtors argue, later purchasers of the loan would lose this valuable protection from bankruptcy discharges. This in turn would diminish the value of loans on the secondary market or force parties to spend resources investigating the original loan transaction for potential fraud.

Id.

Even though the facts here do not involve the public debt market, the Court finds the reasoning of Borschow and the cases it cites persuasive. In real terms, where the difference between Dumont as an individual and the Plaintiff is slight, misrepresentations made to either Dumont or the Plaintiff—a single member LLC of which Dumont is the sole member—would still have to be made to the same person. It would work an injustice upon the Plaintiff to prevent it from attempting to establish nondischargeability under these circumstances. Additionally, nothing the Court has gleaned from New Hampshire law counsels a different holding. In New Hampshire, the general rule is that the "assignee obtains the rights of the assignor at the time of the

11

assignment." Stateline Steel Erectors, Inc. v. Shields, 150 N.H. 332, 336 (2003) (quoting YYY Corp. v. Gazda, 145 N.H. 53, 61 (2000)).  Following this general rule, if the assignor had a potential claim under section 523(a)(2)(A) against the debtor, an assignee creditor should be able to pursue that claim.   For these reasons, the Court finds that the assignment of the Lease does not bar the Plaintiff's claims in Count II.

The balance of the Defendant's arguments relies on heavily contested factual issues surrounding both the pre-lease representations and causation of damage to the Property.  The factual issues make it impossible for the Court to decide the merit of those arguments on summary judgment.  The Court disregards the parts of the Motion that argue as if Count II were premised on section 523(a)(2)(B).   At the hearing, the parties agreed that the Plaintiff was not asserting any such claims.   The Court shall deny the Motion as it pertains to Count II.

   IV. <u>Summary Judgment as to Count III:   CPA & 11 U.S.C. § 523(a)(2)(A)</u>

In Count III, the Plaintiff asks the Court for two things: (1) to determine whether the Defendant is liable under the CPA and (2) to find any damages resulting from that liability to be nondischargeable under section 523(a)(2)(A).  With respect to Count III, the Motion focuses on only the CPA claims and does not mention the nondischargeability aspect.   The Defendant argues that the Court should grant him summary judgment on Count III because he was not in the business of roofing, and the CPA only covers transactions in the ordinary course of business.

NH R.S.A. § 358-A:2—the CPA—provides that "[i]t shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  The terms "trade" and "commerce" are defined in R.S.A. § 358-A:1(II): "'Trade' and 'commerce' shall include the advertising, offering for sale,

sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state."  Although the range of conduct prohibited in the CPA appears broad, the New Hampshire Supreme Court has held otherwise.  Ellis v. Candia Trailers and Snow Equipment, Inc., 164 N.H. 457, 465 (2012) ("We have held that the scope of the CPA is narrower than its broad language may suggest, and that it does not encompass isolated sales or contracts that are not undertaken in the ordinary course of a trade or business.") (citing Hughes v. DiSalvo, 143 N.H. 576 (1999) (holding that the sale of a home from one individual to another, as part of a single, isolated transaction does not come within the ambit of the CPA).

In Ellis, an individual who was in the business of selling and installing truck-bed parts sold his business, Precision Truck.  The buyer later brought claims against the individual seller, claiming violations of the CPA in the conduct of the sale.  The Ellis court held that the sale of the business was not covered by the CPA because the sale of Precision Truck was not in the ordinary course of the seller's business (the selling of truck parts); it appeared to be a single, isolated transaction.  Ellis at 465-66.

Here, the undisputed facts indicate that the Defendant was in the business of running an automotive service business.  It is unquestioned that the Defendant's leasing of space in which to operate the business is an ordinary course transaction.  All of the representations made between Dumont and the Defendant that lead to the execution of the Lease were in furtherance of that goal.  This is true regardless of whether the representations relate to the covenant to repair the roof, or the covenant to pay rent—both included in the Lease.  All of the claims in Count III appear to relate to alleged unfair or deceptive practices the Defendant engaged in to negotiate or perform a lease.

Both the negotiation and performance of the Lease were integral to the ordinary course of the Defendant's business.  Unlike the sale of the business in Ellis, which almost by definition is a one-time transaction, a business such as the Defendant's may enter into any number of commercial real estate leases, consecutively or sequentially, in the ordinary course of its operations.

The Court finds that the claims in Count III come within the protection of the CPA.   The balance of the Motion on this count relates to the level of intent required to breach the CPA, a matter as to which issues of material fact exist.   Accordingly, the Court shall deny the Motion as to Count III.

## CONCLUSION

For the reasons stated above the Court shall grant the Motion as to Count I and deny it as to Counts II and III.   This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.   The Court will issue a separate order consistent with this opinion.

ENTERED at Manchester, New Hampshire.

Date:   September 19, 2014             /s/ Bruce A. Harwood
                                                      Bruce A. Harwood
                                                      Chief Bankruptcy Judge